**FEDERAL DEPOSIT INSURANCE CORPORATION, Appellee,**

v.

**Vermelle Roland FAGAN, Executrix and distributee of the Estate of Wylie H. Fagan, deceased; and Scott M. Waldron, Appellants.**

**FEDERAL DEPOSIT INSURANCE CORPORATION, Appellee,**

v.

**Vermelle Roland FAGAN, Executrix and distributee of the Estate of Wylie H. Fagan, deceased; and, Scott M. Waldron, Appellants.**

**Nos. 80–1050(L), 80–1051.**

United States Court of Appeals, Fourth Circuit.

Argued Nov. 4, 1981.

Decided March 25, 1982.

303

Elizabeth Carpentier, Columbia, S. C. (Hamilton Osborne, Jr., Boyd, Knowlton, Tate & Finlay, Columbia, S. C., on brief), for appellants.

William A. Dallis, Charleston, S. C. (Robert G. Price, Kennedy & Price, Charleston, S. C., on brief), for appellee.

Before HAYNSWORTH, Senior Circuit Judge, and MURNAGHAN and CHAPMAN, Circuit Judges.

**304**

CHAPMAN, Circuit Judge:

Federal Deposit Insurance Corporation ("FDIC") commenced this action seeking recovery on a guaranty agreement executed by Wylie H. Fagan and Scott M. Waldron to American Bank and Trust ("AB&T") dated August 31, 1972. The district court found that as to Fagan the guaranty did not cover credit extended by AB&T after it was advised of Fagan's death. The court further found that Fagan's widow, in her capacity as distributee of Fagan's estate, was responsible only on the note designated as Asset No. L–2268, and the district court denied plaintiff's claim for an attorney's fee. Both parties have appealed. We affirm, except as to the attorney's fee and remand this issue to the district court to set a proper fee.

## FACTS

AB&T was a bank chartered under the laws of the State of South Carolina and had extensive operations in the central part of the state until it was closed by court order in September 1974 and its assets acquired by FDIC. Among the assets taken over by FDIC were certain notes of Fagan & Waldron Associates, Inc., Geneva Construction Co., Inc. and Terracorp, Inc. With these notes was the guaranty agreement executed by Wylie H. Fagan and Scott M. Waldron to AB&T dated August 31, 1972 guaranteeing the indebtednesses of the three above named corporations up to a total amount of $600,000.00.

Wylie Fagan died testate on May 14, 1973, and his will designated his widow, Vermelle Roland Fagan, as executrix and sole beneficiary. At the time of Fagan's death there was an AB&T loan to Terracorp, Inc. dated October 10, 1972 with a principal balance of $40,000.00. On June 21, 1973, AB&T received written notice of Fagan's death. Subsequent thereto the bank continued to lend large sums of money to the three corporations. At the time the bank closed, the total debt of the three corporations to the bank exceeded $1,500,000.00. FDIC seeks to recover $600,000.00, the amount of the guaranty, from Fagan's estate and/or Mrs. Fagan. Waldron, the co-signer of the guaranty, defaulted in this action and later was declared bankrupt. In the bankruptcy proceeding, he was discharged of any responsibility under the guaranty agreement.

By order dated November 6, 1978, the district court granted summary judgment in favor of the executrix of Fagan's estate, but refused to dismiss the action against her in her capacity as a distributee. Thereafter the district court tried the case without a jury and found Mrs. Fagan responsible, as distributee of her husband's estate, under the guaranty agreement for the $40,000.00 note of Terracorp, Inc. outstanding at the time of Mr. Fagan's death. The judgment included interest but denied the claim for an attorney's fee.

Mrs. Fagan qualified as executrix of her husband's estate shortly after his death and published in a local newspaper, as required by South Carolina law, a notice to creditors. There were four publications of this notice between May 21, 1973 and June 8, 1973. No claim for the amounts due upon debts covered by the guaranty agreement was ever filed by AB&T, but on November 22, 1974, FDIC filed its claim against the estate in the Probate Court.

The guaranty agreement provided in part:

This guaranty shall be binding upon the undersigned, his personal representatives, successors and assigns unless and until (and then only with respect to future transactions or commitments) terminated by notice to that effect received by the Bank, by registered mail, addressed to the Bank at the office of the Bank extending credit under this guaranty agreement.

Although the bank received written notice of Fagan's death, it did not receive the notice of termination of the guaranty as required by the agreement.

## I.

■ Did the written notice in June 1973 to AB&T advising it of Fagan's death effectively terminate the guaranty agreement as

to Fagan, his estate or distributees upon any debt which was incurred after notice of death? We find that it did.

In 1858 the South Carolina Supreme Court decided *Knotts v. Butler,* 31 S.C.Eq. (10 Rich.Eq.) 143, 29 S.C.Rep. 54 holding that a guaranty agreement remained in effect after death of the guarantor when the personal representative of the deceased guarantor had not terminated the guaranty by written notice to the creditor as provided in the guaranty agreement. The court stated:

It is asked, how long shall such a guaranty continue in force? and the answer is, until it be ended according to its terms. The administrator on whom the liability devolved, might have given the written notice to the President or Cashier prescribed by the instrument.

This rule is not only ancient, but it is very harsh in its consequences and it is against the decided weight of authority in this country. See *Restatement of Security,* § 87; Chapter 2, § 24 *Suretyship* by Lawrence P. Simpson; § 420, *The Law of Suretyship* by Stearns and Elder. 42 A.L.R. 926, 38 Am.Jur.2d, Guaranty § 65. While a majority holds that death of the guarantor operates as a revocation of the guaranty for future transactions, the rule becomes almost unanimous where notice of the guarantor's death is given to the holder of the guaranty agreement.

We find that the South Carolina Supreme Court would not now follow *Knotts v. Butler* so as to require notice of revocation by registered mail when the bank had already received written notice of the guarantor's death.

FDIC argues that under the terms of the agreement, as interpreted by *Knotts v. Butler,* written notice to the bank by registered mail specifically notifying the bank of cancellation of the guaranty was required to relieve Fagan, his estate and his heirs from responsibility for future loans to the three corporations. This is placing form over substance. The form of the notice should not be controlling, if such notice is sufficient to unequivocally advise the bank of

the guarantor's death. The rights of the creditor are adequately protected if revocation does not become effective until the creditor has received such notice, and such revocation does not effect obligations outstanding at the time of death. Certainly, a creditor should not be allowed to add $1,500,000.00 to the debts of a deceased person, after receiving notice of his death. The bank knew that Fagan was deceased and, therefore, no longer active in the management of the three corporations, and he could in no way benefit from subsequent loans from the bank to the corporations.

The underlying reason for the rule that notice of death revokes the agreement is well stated in the landmark case of *Jordan v. Dobbins,* 122 Mass. 168, 23 Am.Rep. 305 (1877).

The agreement which the guarantor makes with the person receiving the guaranty is not that I now become liable to you for anything, but that if you sell goods to a third person, I will then become liable to pay for them if such third person does not. It is of the nature of an authority to sell goods upon the credit of the guarantor, rather than a contract which cannot be rescinded except by mutual consent. Thus such a guaranty is revocable by the guarantor at any time before it is acted upon. Such being the nature of a guaranty, we are of the opinion that the death of the guarantor operates as a revocation if it, and that the person holding it cannot recover against his executor or administrator for goods sold after his death. Death terminates the power of the deceased to act, and revokes any authority or license he may have given, if it has not been executed or acted upon. His estate is held upon any contract upon which a liability exists at the time of his death, although it may depend upon future contingencies. But it is not held for a liability which is created after his death, by the exercise of a power or authority which he might at any time revoke.

In § 87, *Restatement of Security,* the reason for the rule is succinctly stated "A dead

surety can make no contract nor can a dead man request a creditor to make the advances."

## II.

■ Claims against Mrs. Fagan, in her capacity as executrix of the estate of her husband, are obviously barred by the creditor's failure to file a statement of debts within the time provided by South Carolina law.

Section 21–15–650 NO LIABILITY IF CREDITOR NEGLECTS TO GIVE STATEMENT

If any creditor shall neglect to give in a statement of his debts within the time aforesaid the executors or administrators shall not be liable to make good the same.

The time mentioned in the above section is five months after the first publication of notice to creditors and is contained in § 21–15–640.

## III.

Counsel in both briefs and arguments spend considerable time on the issue of whether South Carolina has a "non-claim statute"[1] which absolutely and forever bars suits by creditors against a deceased debtor's estate, his executor or administrator or his heirs unless claim is filed by the creditor in the Probate Court within the time provided by such statute. Fortunately, it is not necessary for this court to decide this question, which hopefully can be left to the South Carolina Supreme Court for decision in some future case.[2]

■ The language of the guaranty is clear and unequivocal and covers the guarantor and his "successors". His wife as his sole beneficiary is the successor to his properties and assets. FDIC may, therefore, follow the assets from his estate into her hands to effect recovery of the note outstanding at the time AB&T received notice of Fagan's death.

## IV.

■ The district court found that FDIC was not entitled to be paid a reasonable attorney's fee because the testator, Mr. Fagan, was not a maker or endorser of any note covered by the guaranty agreement and the guaranty does not specifically refer to attorney's fees. The district court found that the guaranty referred to the debt "with interest" but was silent on the question of attorney's fees and, therefore, the same were not covered.

Unfortunately, there is no South Carolina case directly in point, but the language of the note evidences a clear intention to cover attorney's fees on the note subject to the guaranty agreement. The guaranty agreement executed by Fagan and his partner guaranteed the payment of the obligations of Geneva Construction Co., Inc., Terracorp, Inc. and Fagan and Waldron Associates and included the following language:

[T]he undersigned (who, if two or more in number, shall be jointly and severally bound) hereby unconditionally guarantees to the Bank and its successors, endorsees and assigns the punctual payment when due, with such interest as may accrue thereon either before or after any maturity (ies) thereof, of *all debts and obligations* of the Borrower .... (Emphasis added).

The payment of a reasonable attorney's fee was an obligation of the borrower under the note covered by the guaranty agreement. Other courts which have faced this problem have found attorney's fees to be covered by guaranty agreements. *National Bank and Trust Co. v. Becker*, 50 Ill.App.2d

---

1. Section 21–15–640, South Carolina Code of Laws (1976).

2. This issue is complicated by *Dubuque Fire & Marine Insurance Co. v. Wilson*, 213 F.2d 115 (4th Cir. 1954) in which this court decided South Carolina did not have a "non-claim statute". However, *Dubuque* appears to have overlooked a 1943 amendment to the South Carolina Code. This amendment, in the opinion of the South Carolina Attorney General and also Professor Coleman Karesh, then the leading authority on probate law in South Carolina, changed South Carolina to a "non-claim" state. See 1964 Opinions of the Attorney General 296, 298, and 8 South Carolina Law Quarterly 162 (1955).

151, 200 N.E.2d 40 (1946); *Townsend v. Alewel,* 202 S.W. 447, 448 (Mo.App.1918); *Warner-Lambert Pharmaceutical Co. v. Sylk,* 471 F.2d 1137 (3rd Cir. 1972).

Therefore, the judgment of the district court is affirmed, except as to the issue of the attorney's fee, and the case is remanded to allow the district judge to set a proper attorney's fee for the plaintiff's attorney, such fee to relate only to services in connection with collection of the $40,000.00 note.

AFFIRMED IN PART; REMANDED IN PART.

MURNAGHAN, Circuit Judge, dissenting:

Agreeing in all other respects with my panel colleagues, I find myself in dissent as to the denial to FDIC of a full recovery in the amount of $600,000 on the guaranty executed by Wylie Fagan. In my view, the pertinent distinction has not been observed between (a) the presumed intent of termination where language is silent or ambiguous as to whether the guaranty continues against the guarantor's estate for new advances made after notice of the guarantor's death, and (b) the effect to be accorded an altogether unambiguous contract expressing clearly an intent that new advances following the guarantor's death will be binding on his estate unless and until there is notice to the lender of termination of the guaranty.

The language here is unambiguous, rendering irrelevant the authorities cited by the majority for the proposition that there is a strong presumption that notice to the lender of a guarantor's death operates to terminate the guaranty insofar as future advances are concerned. Guaranty agreements, like other contracts, are interpreted in accordance with the intent of the parties. 4 S. Williston, Contracts § 625 at 828 (3d ed 1961) ("[I]n their interpretation we are to seek for the true intent of the parties who executed them."). Absent clear intervening and countervailing public policy which would absolutely prohibit a guaranty from continuing against a guarantor's estate, however clear the guarantor had made it that he wished such a continuation, we should enforce, not disregard, the contractual undertaking. *See, e.g., Warren v. Pilgrim Health & Life Ins. Co.,* 217 S.C. 453, 456, 60 S.E.2d 891, 893 (1950) ("A sound public policy requires the enforcement of contracts deliberately made, which do not clearly contravene some positive law or rule of public morals."), quoting *Crosswell v. Conn. Indemnity Association,* 51 S.C. 103, 116, 28 S.E. 200, 205 (1896); *Lipps v. First American Service Corp.,* Va., 286 S.E.2d 215, 222 V.R.R. 920, 924 (1982), quoting with approval *Wallihan v. Hughes,* 196 Va. 117, 125, 82 S.E.2d 553, 558 (1954).[1]

An undertaking made by Fagan clearly binding his estate to become a guarantor even as to advances made after his death and notice thereof to the lender was one which he surely could legally impose upon his estate and personal representatives.

Thus *Jordan v. Dobbins,* 122 Mass. 168, 169, 23 Am.Rep. 305 (1877) relied upon by the majority, is inapposite. There the guaranty agreement provided as follows:

> For value received ... the undersigned does hereby guaranty to Jordan, Marsh & Co. the prompt payment by George E. Moore to Jordan, Marsh & Co., at maturity, of all sums of money and debts which he may hereafter owe Jordan, Marsh & Co. ... [T]his guaranty shall be a continuing guaranty, and apply to and be available to said Jordan, Marsh & Co., for all sales of merchandise they may make to said George E. Moore until written notice shall have been given by the undersigned to said Jordan, Marsh & Co. and received by them, that it shall not apply to future purchases.

There was no provision in the contract regarding the guarantor's death, and conse-

---

1. The law looks with favor upon the making of contracts between competent parties upon valid consideration and for lawful purposes. Public policy has its place in the law of contracts—yet that will-o'-the-wisp of the law varies and changes with the interests, habits, need, sentiments and fashions of the day, and courts are averse to holding contracts unenforceable on the grounds of public policy unless their illegality is clear and certain.

quently there was room for construction consistent with the proposition that the parties to the contract did not intend the guaranty to remain valid as to future advances following death of the guarantor and notice of the death to the lender.

The majority takes note of *Knotts v. Butler*, 31 S.C.Eq. (10 Rich.Eq.) 143 (1858), a South Carolina case which held that a guarantor's estate was liable in accordance with the agreement for debts incurred after the guarantor's death, since the guaranty had not been revoked by written notice, as the agreement required. The majority contends that, notwithstanding *Knotts*, the South Carolina courts would today reach a different result when notice of death, but not notice of revocation, was provided. Such a reversal of the law of South Carolina, however, would at most merely reflect a determination that the language was in fact ambiguous, permitting an interpretation to the effect that the parties did not intend the guaranty to apply to new advances even after notice to the lender of the guarantor's death. Hence, a refusal to follow *Knotts* does not require, or even support, the result reached by the majority.

Moreover, I submit that the reading for *Knotts* favored by the majority is simply not sustainable. To the contrary, *Knotts* implies that the clear terms of the contract govern, even with respect to obligations not yet incurred at the time of death. The Chancellor, in language deemed dispositive by the appellate court, there first stated that the guaranty did not merely constitute the guarantor a principal with the agency of the borrower revoked by the guarantor's death. Instead:

> The guaranty ... is a contract to indemnify against certain acts of third persons, and to assume a future contingent liability, if these acts be done. What obstructs one from indemnifying against the consequences of an event which may not happen for more than four years after his death, more than giving his promissory

note, which may not reach maturity for more than four years from his death? It is asked, how long shall such a guaranty continue in force? and the answer is, until it be ended *according to its terms.* The administrator on whom the liability devolved, might have given the written notice to the President or cashier, *prescribed by the instrument.*[2]

31 S.C.Eq. at 146 (emphasis added).

A contrary view would conflict with the general rule. "If the guaranty is properly classified as a contract (or an irrevocable offer), death of the guarantor does not terminate *the contract.*" 38 Am.Jur.2d § 65 at 1066 (emphasis added). *See also* Annotation, 42 A.L.R. 926, 927 ("If the consideration is entire and has already passed, then the guarantor's estate should not be released by reason of his death, even though the guarantee has knowledge thereof ...."). That the terms of the guaranty agreement govern was made clear in *Bennett v. Checotah State Bank of Checotah,* 176 Okla. 518, 56 P.2d 848 (1936), where the court held that a guarantor's estate was liable, in accordance with the terms of the contract, for debts for which extensions were granted *after the death* of the guarantor. "In view of the rule that death of the guarantor does not revoke the guaranty in cases such as the instant one, it follows that death did not revoke *any part* of said guaranty." 176 Okla. at 519, 56 P.2d at 850 (emphasis in original).

In the present case, the language leaves no room for interpretation. It reads:

> This guaranty shall be binding upon the undersigned, his personal representatives, successors and assigns unless and until (and then only with respect to future transactions or commitments) terminated by notice to that effect received by the Bank, by registered mail, addressed to the Bank at the office of the Bank extending credit under this guaranty agreement.

---

**2.** The guaranty provided:

we declare this to be a continuing guaranty, and that it is to remain of force *till revoked*

by written notice to the President or Cashier of said bank.

31 S.C.Eq. at 143 (emphasis added).

That language explicitly states that notice of termination of the guaranty, not notice of the guarantor's death, shall be the operative event. It further extends the obligation to personal representatives, successors and assigns.

It should not be overlooked that there could well be reasons why, from the standpoint of the guarantor who has died, he might desire a continuation of the guaranty even as to future transactions. Past commitments made to the borrower may have appeared to the guarantor a creator of substantial potential for gain. The loss in midstream of future credit because of the termination of the guaranty might threaten the loss of all previous investment. The guarantor offends no public policy in preferring to throw in further investment sums to guard against such a probability of loss.

The question is not whether he may do so. He clearly may. Rather, it is simply whether, as a matter of construction, he has indeed done so. Here the guarantor, Fagan, has explicitly provided that the guaranty should continue until notice of its revocation. The party signing the contract with him had the right to rely on the undertaking he made. Fagan was an experienced businessman under no incapacity and his estate should be bound by the terms to which he agreed.

Accordingly, I would reverse to the extent required to direct recovery of a judgment in the full amount of $600,000 in favor of the FDIC.